**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

**NUVOX COMMUNICATIONS, INC., and
XPEDIUS COMMUNICATIONS, LLC,**

      **Plaintiffs,**

**v.**                                  **CASE 4:06-cv-308-SPM**

**LISA POLAK EDGAR, chairman of the
Florida Public Service Commission, in
her official capacity; and J. TERRY DEASON,
ISILIO ARRIAGA, MATTHEW CARTER, II,
and KATRINA TEW in their official
capacities as Commissioners of the
Florida Public Service Commission,**

      **Defendants.**

_____/

**ORDER ON PSC APPEAL**

      **THIS CAUSE** comes before the Court as an appeal from a decision of the

Florida Public Service Commission ("FPSC") pursuant to 47 U.S.C. § 252(e)(6).

The Court has received briefs from all parties and has carefully reviewed the

administrative record, consisting of more than 38 binders and various sealed

packages.  After considering the issues presented, the Court finds that all issues

but one should be affirmed.

**<u>INTRODUCTION:</u>**

      The Telecommunications Act of 1996 "created 'a new telecommunications

regime designed to foster competition in local telephone markets.'"  <u>Nixon v.

Missouri Mun. League</u>, 541 U.S. 125 (2004)(*quoting* <u>Verizon Md. Inc. v. Public</u>

<u>Serv. Comm'n of Md.</u>, 535 U.S. 635, 638 (2002)).  It requires incumbent local exchange carriers ("ILEC"), such as BellSouth, to lease unbundled network elements ("UNE") to competitive local exchange carriers ("CLEC") such as Nuvox Communications and Xspedius Communications, the plaintiffs in this case.  Once a CLEC requests to lease network elements from an ILEC, the parties negotiate and memorialize the terms in an interconnection agreement ("ICA").  If the parties are unable to agree on all terms, they may petition a state commission (in this case, the FPSC) to arbitrate the remaining issues.  47 U.S.C. § 252(a)-(b).  The Act provides that "any party aggrieved by such [arbitration] may bring an action in an appropriate Federal district court to determine whether the agreement or statement meets the requirements of section 251 of this title and this section."  47 U.S.C. § 252(e)(6).

## HISTORY:

Plaintiffs requested to lease UNE's from BellSouth in order to provide competition for various broadband services such as DSL.[1]  Unable to agree on all terms of the lease, Plaintiffs and BellSouth submitted their ICA's to arbitration in February 2004 with 104 separate issues.  Discovery and a hearing winnowed the dispute to 20 issues which were resolved in the FPSC's arbitration order of October 11, 2005.[2]  That order was later adopted in June of 2006, giving the

---

[1]  Digital Subscriber Line.

[2]  <u>Final Order Regarding Petition for Arbitration</u>, PSC-05-0975-FOF-TP, Oct. 11, 2005.

ICA's final approval.[3]  This appeal follows with six issues consolidated into four

counts as set out in the amended complaint.

## STANDARD OF REVIEW:

The Court adopts the well-reasoned approach on this issue in MCI

Telecomm. Corp. v. BellSouth Telecomms., Inc., 112 F. Supp. 2d 1286 (N.D. Fla.

2000).  There, Judge Hinkle concluded that court review of the interpretation of

the Telecommunications Act of 1996 should be de novo, but that a state

commission's actions under the Act should be reviewed under the arbitrary and

capricious standard.  Id. at 1290.  These differing standards are appropriate

because, while state commissions have no particular expertise in interpreting

federal statutes, they do possess considerable expertise "in the

telecommunications field generally and in the state at issue in particular."  Id. at

1291.

## LEGISLATIVE BACKGROUND:

In order to understand the references made throughout this order to

various reports and rules, a brief history of the Act is provided here.  As noted

supra, the Telecommunications Act of 1996 was passed by Congress to promote

competition among telephony service providers.  The Act required the Federal

Communications Commission ("FCC") to implement regulations to carry out the

mandates set forth in the Act.  In order to accomplish this task, the FCC

---

[3] Order Approving Arbitration Interconnection Agreements, PSC-06-0477-FOF-TP, Jun.
5, 2006.

published notices of proposed rulemaking, held hearings, took testimony, and

rendered orders adopting those rules.  There are a number of FCC orders which

are cited by the parties and the Court.  Many of them have alternate titles and

multiple docket numbers.  For clarity's sake, the three most referenced orders

are abbreviated as **TRO**[4] (Triennial Remand Order, FCC #03-36, Aug. 21, 2003),

the **FAO** (Final Order Regarding Petition for Arbitration, PSC-05-0975-FOF-TP,

Oct. 11, 2005), and the **Errata** (Triennial Review Errata, FCC #03-227, Sept. 17,

2003).  The remaining orders are cited by FCC case numbers:

- FCC #96-325:  Local Competition First Report and Order (Local Competition Order), Aug. 8, 1996
- FCC #99-238: Local Competition Third Report and Order (UNE Remand Order), Nov. 5, 1999
- FCC #00-183: Supplemental Order Clarification, Jun. 2, 2000
- FCC #99-355: Local Competition Fourth Report and Order, Advanced Services Third Report and Order (Line Sharing Order), Dec. 9, 1999
- FCC # 04-164: Second Report and Order (All-or-Nothing Order), Jul. 13, 2004
- FCC #00-183: Supplemental Order Clarification, Jun. 2, 2000.

Before embarking on analysis of the issues, a quote from AT&T Corp. v.

Iowa Utils. Bd., 525 U.S. 366 (1999), bears repeating:

It would be gross understatement to say that the 1996 Act is not a model of clarity.  It is in many important respects a model of ambiguity or indeed even self-contradiction.  That is most unfortunate for a piece of legislation that profoundly affects a crucial

---

[4] Triennial Review Order, so named because the FCC reexamines its UNE policies under the Act every three years.

segment of the economy worth tens of billions of dollars.

Id. at 397.  The same holds true for the TRO.  A reviewing court can only muddle

through and hope for the best:

> The rapidly evolving judicial, administrative and technological
> developments in the telecommunications field render the task of the
> Florida Commission (and this court on review) somewhat akin to
> shooting at a moving target, one whose movements are neither
> constant nor predictable.

MCI Telecomms. Corp. v. BellSouth Telecomms, Inc., 112 F. Supp. 2d 1286,

1293 n.10 (N.D. Fla. 2000).

That having been said, each issue is now examined in turn.

## CLAIM 1: COMMINGLING

### Introduction

The issue as framed by BellSouth is whether BellSouth, as an ILEC, has

an obligation to commingle §271 checklist elements[5] with §251 network

elements. It argues that the deletion of a particular clause in paragraph 584 of

the TRO demonstrates that the FCC did not intend commingling to apply to §271

elements.  Plaintiffs, on the other hand, argue that BellSouth's interpretation

creates an exception where none exists.

It should first be noted that there is no clear answer.  States have reached

differing conclusions based on the same set of facts, and some states have

---

[5] "Checklist elements" are those elements listed in the "competitive checklist" section of
47 U.S.C. § 271(c)(2)(B).  It is a list of elements that the ILEC must offer to CLEC's without which
the CLEC's would be impaired and unable to effectively compete in the marketplace.

reversed their previous decisions after further examination.  As examples,

Minnesota, New York and Mississippi have declined to apply the commingling

requirement to 271 elements, while a number of other states (Alabama, Utah,

Kentucky, Washington, California, and North Carolina) have reached the

opposite conclusion.  Further, the Utah Public Service Commission originally held

that 271 elements were not required to be commingled.  Upon reconsideration,

the commission decided that the commingling requirement did in fact include 271

elements and that the prohibition was simply against 271 elements replacing 251

in unbundling agreements.  *See* Order on Reconsideration, #04-2277-02 (Apr.

13, 2005).

The FPSC in this case interpreted the TRO in such a manner as to

prohibit commingling of UNE's with 271 elements, stating: "We find that striking

the reference to section 271 means BellSouth's commingling obligation does not

extend to elements obtained pursuant to section 271."  FAO at 19.  Because this

dispute centers around the correctness of the FPSC's interpretation, *de novo*

review is appropriate.  <u>MCI Telecomm. Corp. v. BellSouth Telecomms., Inc.</u>, 112

F. Supp. 2d 1286 (N.D. Fla. 2000).

<u>*Discussion*</u>

The FCC was concerned about ensuring that CLEC's are permitted to

commingle UNE's with wholesale services, and this phrasing appears throughout

the TRO.  As examples, paragraph 579 states:

> [A]n [ILEC] shall permit a [CLEC] to commingle a UNE or a UNE combination with one or more facilities or services that a requesting carrier has obtained at wholesale from an [ILEC] pursuant to a method other than unbundling under section 251(c)(3) of the Act.

Paragraph 581 provides:

> The Act grants authority for the [FCC] to adopt rules to permit the commingling of UNE's and combinations of UNE's with wholesale services, including interstate access services.

FCC Rule 51.309(e) reads, in pertinent part:

> [A]n [ILEC] shall permit a [CLEC] to commingle an unbundled network element or a combination of unbundled network elements with wholesale services obtained from an [ILEC].

Some portions of the TRO use examples of wholesale service without specifically using that term.  Paragraph 583 states, "Commingling allows a [CLEC] to connect or attach a UNE or UNE combination with an interstate access service . . . .," and in turn, "interstate access service" is defined as a wholesale service by paragraph 585.

Finally, paragraph 584 originally included a reference to 271 checklist elements:

> As a final matter, we require that ILEC's permit commingling of UNE's and UNE combinations with other wholesale facilities and services, including any network elements unbundled pursuant to section 271 and any services offered for resale pursuant to section 251(c)(4) of the Act.

However, the Errata Sheet deleted a clause in that sentence, causing it to read:

> As a final matter, we require that ILEC's permit commingling of UNE's and UNE combinations with other wholesale facilities and services, including ~~any network elements unbundled pursuant to~~

~~section 271 and~~ any services offered for resale pursuant to section
251(c)(4) of the Act.

BellSouth points to this deletion as proof that the FCC did not intend the

commingling requirement to apply to §271 checklist elements.

The common element of all the above paragraphs is the requirement that

commingling applies to wholesale facilities and services.  If §271 checklist

elements are wholesale facilities and services, then the commingling requirement

does in fact apply to those elements as well.

Having reviewed the decisions of multiple states' public commissions, this

Court finds persuasive the logic of requiring commingling of 271 elements based

on the conclusion that 271 checklist elements are wholesale facilities and

services.  Utah and Colorado have concluded, without further explanation, that

"there can be no dispute" that 271 elements are wholesale elements.  Detailed

support for this conclusion, however, is supplied by the North Carolina Utility

Commission, which first points out that the dictionary definition of "wholesale" fits

271 elements, and secondly notes that the FCC itself agrees.  See Order

Concerning Changes of Law, #P-55, Sub. 1549 (Mar. 1, 2006) at 111 (referring

to remarks made in 2003 by FCC Commissioner Kathleen Abernathy and to a

press release stating that ILEC's have "section 271 obligations to provide

wholesale access to local loops, local transport, and local switching at just and

reasonable prices").  Finally, the FCC has specifically used the term "section

271(c) wholesale obligations," which would seem to alleviate any doubt about the

matter.[6]

BellSouth provides no support which would enable this Court to reach any other conclusion.  The FCC has required commingling with any element obtained through wholesale.  Tariffed services are listed as examples of such wholesale services (*see* TRO ¶¶581, 583, 585), but the word "including" indicates that the item is used as an example and does not denote an exhaustive list.

Reading the relevant paragraphs of the TRO in context, it becomes apparent that the Errata deletions were made in order to avoid conflating distinct concepts.  For example, paragraph 584 addresses BellSouth's resale obligations. The modification to paragraph 584 simply eliminated the irrelevant UNE clause. Errata at 3, ¶27.  Similarly, the last sentence of footnote 1990 was deleted in order to avoid contradicting the paragraph which contained it.  Errata at 3, ¶31. That paragraph, in pertinent part, noted that "BOC obligations under Section 271 are not necessarily relieved based on any determination we make under the Section 251 unbundling analysis."  TRO ¶655.  Maintaining consistency required the removal of a footnote declining to apply the commingling rule to "services that must be offered pursuant to these checklist items," *i.e.*, section 271 elements.

Thus, the Court finds that the FPSC misinterpreted the TRO to prohibit commingling of 251 elements with 271 checklist elements.

---

[6] Qwest Communications Int'l Inc.'s Petition for Forbearance Under 47 U.S.C. § 160(c), at ¶¶ 68, 100, 103, and 105.

## CLAIM 2: LINE CONDITIONING

The parties next disagree on the extent to which BellSouth should be required to condition its copper loops.  BellSouth interprets the law as requiring it to condition loops to permit CLEC's to provide DSL services to the extent that BellSouth conditions lines for its own use.  Plaintiffs argue that this definition is too restrictive and prevents CLEC's from offering other, higher-speed services that may require additional conditioning.  BellSouth counters by claiming that such extensive conditioning would essentially provide a "superior" network above and beyond the "at least equal" standard enumerated in 47 C.F.R. § 51.311(b).

The main controversy stems from two seemingly inconsistent clauses in 47 C.F.R. § 51.319, the rule dealing with specific unbundling requirements.  The very first sentence of the line conditioning section, 47 C.F.R. § 51.319(a)(1)(iii), reads:

> The incumbent LEC shall condition a copper loop . . . to ensure that
> [it] . . . is suitable for providing digital subscriber line services,
> including those provided over the high frequency portion of the
> copper loop . . . , whether or not the incumbent LEC offers
> advanced services[7] to the end-user customer on the that copper
> loop or copper subloop.

Line conditioning is then defined in subsection (A) as:

> the removal from a copper loop . . . of any device that could

---

[7]  Advanced services are defined as "high-speed, switched, broadband, wireline telecommunications capability that enables users to originate and receive high-quality voice, data, graphics or video telecommunications using any technology."  Advanced Services First Report and Order, FCC #99-48 at 2.

> diminish the capability of the loop . . . to deliver high-speed
> switched wireline telecommunications capability, including digital
> subscriber line service.

BellSouth relies on the first sentence to argue that it need only condition lines for xDSL[8] and nothing more extensive.  Plaintiffs rely on the second sentence to argue that BellSouth should condition lines for other high-speed wired services, not just DSL.

It is not clear what services, in addition to DSL, Plaintiffs propose to offer that would require additional loop conditioning.  What is clear is the FCC's intent to foster competition among providers with respect to one of the most commonly-utilized methods of gaining broadband Internet access: digital subscriber line, or DSL, service.  Almost all of the FCC's notices, reports and orders focus on DSL as a broadband service that CLEC's are anxious to offer end-user customers.  *See, e.g.,* FCC #99-355 at 3-4, 8-9.  To that end, the FCC has required that BellSouth perform certain actions which will specifically enable CLEC's to provide DSL service.

See, for example, the language in the line-sharing order ("In this Order we adopt measures to promote the availability of competitive broadband xDSL-based services . . . .", FCC #99-355 at 4; "This will enable competitive LECs to compete with incumbent LECs to provide to consumers xDSL-based

---

[8] xDSL refers to the various "flavors" of DSL, such as ADSL, HDSL, and VDSL.  This order uses the terms DSL and xDSL interchangeably.

services . . . ." Id.; "These rules will significantly benefit the rapid and efficient

deployment of xDSL-based technologies." Id. at 5).  The line-sharing order

further specifies that BellSouth (and other ILEC's) "must condition loops to

enable requesting carriers to provide acceptable forms of xDSL-based services

over the high frequency portion of the loop . . . ." Id. at 6.  The order concludes

that "except in specific circumstances, incumbent LECs must condition loops to

enable requesting carriers to provide xDSL-based services on the same loops

the incumbent is providing analog voice service, regardless of loop length." Id.

This focus on DSL is echoed in subsequent orders, including the TRO,

which explains the rationale behind the need for line conditioning:

> Line conditioning is necessary because of the characteristics of
> xDSL service–that is, certain devices added to the local loop in
> order to facilitate the provision of voice service disrupt the capability
> of the loop in the provision of xDSL services.  In particular, bridge
> taps, load coils, and other equipment disrupt xDSL transmission.
> Because providing a local loop without conditioning the loop for
> xDSL services would fail to address the impairment competitive
> LEC's face, we require incumbent LEC's to provide line conditioning
> to requesting carriers.

TRO ¶642.  References to conditioning loops for xDSL services are seen

throughout the TRO (see footnote 21 to the PSC's arbitration order, appearing on

page 25).  It is clear that the FCC's goal in requiring line conditioning was to

enable CLEC's to offer various types of DSL services in competition with ILEC's.

As observed *supra*, Plaintiffs offer no examples of other broadband

services which would require conditioning loops above and beyond what is

currently required for providing DSL services.  The PSC makes the following statement: "We note that higher-speed services could require more line conditioning than xDSL services."  FAO at 25.  However, this statement is never expanded upon or explained, and Plaintiffs have provided the Court with no examples of services that are 1) technically feasible and 2) would require additional line conditioning.  From the record before it, the Court finds that the FPSC properly interpreted the FCC's requirement that BellSouth remove accretive devices which would impair a CLEC's ability to offer DSL to customers, and this interpretation was properly implemented by the PSC's arbitration order.[9]

**Load Coils at 18,000 Feet**

Plaintiffs' next argument is that BellSouth should be required to remove load coils on loops greater than 18,000 feet at TELRIC[10] prices.  BellSouth responds that it does not remove load coils at that length for its own customers and should not be required to do more than what it does for itself.

Load coils are required because of copper's inability to transmit quality voice signals over a certain length.  These coils, however, do not permit DSL signals to be transmitted properly (or at all).  Thus, a loop over 18,000 feet can provide either voice service or DSL, but not both simultaneously.  Conditioning a

---

[9]  Plaintiff additionally argues that the PSC's arbitration order, by requiring BellSouth to provide line conditioning "equal to that which [it] provides to itself," would permit BellSouth to refuse to condition the lines simply by declining to offer DSL services to its own customers. However, Rule 51.319(a)(1)(iii) explicitly provides that ILEC's must condition the loop for DSL services even if the ILEC itself is not currently offering those services.

[10]  Total Element Long-Run Incremental Cost.

loop at that length defeats the ultimate goal of line conditioning, which is to enable line sharing (using the same loop facility for both voice and DSL simultaneously).

Additionally, BellSouth has provided testimony demonstrating the costly and involved nature of removing load coils, which involves digging up the splice case, locating and removing the loop, reclosing and reburying the case, and relandscaping the affected location, including replacing asphalt or concrete when necessary.  BellSouth presumably does not condition lines over 18,000 feet for this reason, and it makes little sense to compel BellSouth to take on this expensive endeavor for Plaintiffs, especially when Plaintiffs have not produced any evidence of what services they would be deploying over those loops.[11]

As the FPSC noted, the risk to BellSouth's network outweighs any slight competitive advantage Plaintiffs might obtain from this conditioning.  Both ILEC's and CLEC's have multiple alternative options available to them for providing broadband service over 18,000 feet, including remote terminals, DSLAM,[12] and T1 services.  The FPSC noted in its order that Plaintiffs are successfully utilizing T1 loops to serve their customers.

BellSouth is not refusing to remove coils on loops over 18,000 feet; it simply argues that it should be permitted to recoup the costs pursuant to its

---

[11]  Further, in a forward-looking environment, loops greater than 18,000 feet should be fiber-fed, not copper, thereby eliminating the need for any line conditioning at all.

[12]  Digital Subscriber Line Access Multiplexer.

special construction tariff.  The TRO agrees that such a situation may warrant non-TELRIC prices and gives the states discretion to rule accordingly: "A state commission could decide, for example, that loop conditioning costs should be recovered through a [non-recurring charge] only in extraordinary situations, such as removing load coils on loops that exceed 18,000 feet in length . . . ."  TRO ¶641.  The FPSC's decision on this issue comports with the applicable law.

**Bridged Taps at 2,500 Feet**

A similar argument is made with respect to the removal of bridged taps at less than 2,500 feet.  Bridged taps, which permit the loop to terminate in more than one location and thus increase the number of users reached by the loop, also impede DSL service.  Plaintiffs believe that BellSouth should be restricted to charging TELRIC rates for removal of bridged taps at less than 2,500 feet.

The TRO requires that ILEC's "must provide access, on an unbundled basis, to xDSL-capable stand-alone copper loops because competitive LEC's are impaired without such loops."  TRO ¶642.  Bridged tap removal is another example of line conditioning, which ILEC's must perform for CLEC's in order to maintain parity and nondiscriminatory access.  Similar to the load-coil problem, removing bridged taps presents "significant operational issues" and is a "'time-consuming and therefore costly challenge.'" FAO at 40.

The FPSC's guiding principle, which this Court finds to be a sound one, is that the need to remove bridged tap is determined by the retail service to be

provided.  Id.  In this case, Plaintiffs have stated a desire to use Etherloop and

G.SHDSL, both of which are required by industry standards to work with multiple

bridged taps.  Id. at 39.  BellSouth also notes that "'all industry xDSL standards

and most proprietary xDSL standards are designed to work on a standard

network . . . which includes the presence of bridged taps.'"  Id.  This design has

relieved BellSouth of the need to remove taps for its own xDSL customers, id. at

38, and BellSouth has received very few requests for bridged tap removal,

indicating that such removal is simply not necessary in most cases.  (It is worth

noting that Plaintiffs have not requested any bridged tap removals in the past

year.)  Id. at 39.

Finally, BellSouth has offered to engage in cooperative testing with any

CLEC experiencing transmission interference to determine whether bridged taps

are the cause.  The CLEC may also submit test measurements indicating the

likelihood of bridged tap interference.

Available record evidence indicates that BellSouth has provided (or is

willing to provide) a loop meeting all requirements necessary for Plaintiffs to offer

its desired DSL services.  The FPSC was correct in its decision in this regard.

## CLAIM 3:  AUDITING PRACTICES

The TRO authorizes an ILEC to audit a CLEC in order to determine

reasonable compliance with local usage requirements. TRO ¶621 (2003).  The

parties here dispute how much detail and specificity the ILEC should include in

the notice of an audit it gives to the CLEC.

The TRO gives an ILEC a "limited" right to audit and says that audits "'will only be undertaken when the incumbent LEC has a concern that a requesting carrier has not met [certain] criteria . . . .'" Id. Unless the audit finds non-compliance, an ILEC cannot conduct an audit more than once per year. The FCC believes that this limitation "strikes the appropriate balance between the incumbent LECs' need for usage information and risk of illegitimate audits that impose costs on qualifying carriers."  TRO ¶626.

In addition to the annual audit protection for CLECs, the order contains a fee-shifting reimbursement requirement.  FCC #00-183; TRO ¶627. If the audit finds material non-compliance, the CLEC must reimburse the ILEC for the cost of the audit. Id. If the audit finds material compliance, then the ILEC must reimburse the CLEC for costs incurred from the audit.  TRO ¶628. The FCC specifically states that it expects this requirement to "eliminate the potential for abusive or unfounded audits, so that an incumbent LEC will only rely on the audit mechanism in appropriate circumstances." Id. The FCC also requires that the notice of an audit be written and provided to the CLEC thirty days prior to the audit. Id. at n.1898. In relation to the scope of the audit, the FCC says that the independent auditor, "consistent with standard auditing practices," will design the compliance testing, "which typically include[s] an examination of a sample selected in accordance with the independent auditor's judgment." TRO ¶626.

Plaintiffs argue that BellSouth should be required to include in the notice of audit the identity of the specific circuits that BellSouth plans to audit and to provide all supporting documentation of the cause that forms the basis of BellSouth's belief of the need for the audit. The FPSC decided that although BellSouth must give written notice thirty days prior to the date that BellSouth seeks to audit and include in the notice the cause for the audit, it does not have to provide identity of specific circuits or detailed documentation. The Plaintiffs argue that this creates the potential for overly burdensome audits.

Although the FCC observes that the audit right of an ILEC is "limited" and that an ILEC should only conduct audits when it has a "concern," the only specific requirements the FCC places on an ILEC's ability to audit are 1) that an audit cannot be conducted more than once per year; 2) that the ILEC must provide written notice thirty days prior to the audit; and 3) that one party will reimburse the other for the costs of the audit depending on the outcome of the audit. Nothing in the FCC's TRO indicates that the ILEC must provide the CLEC with information on the specific circuits to be audited or detailed documentation to support the ILEC's concern. Plaintiffs argue, however, that identifying specific circuits and providing specific documentation is necessarily implicit in the FCC's discussion of notice and "concern."

The lack of a specific mandate for ILECs to identify the circuits or provide detailed documentation is telling. The FCC, as shown by the annual audit and

reimbursement requirements, is capable of specific mandates. See BellSouth
Telcomms., Inc. v. NuVox Communications, Inc., 2006 WL 2617123, at *40-41
(N.D. Ga. Sept. 12, 2006) (holding that non-mandatory language was only
discretionary because "[t]he FCC has demonstrated both the will and the ability
to use mandatory language when it wishes to issue commands."). The TRO
adopted language of the Supplemental Order Clarification in discussing the fact
that audits are limited and should be based on a "concern." See TRO ¶621; FCC
#00-183 ¶29.  However, the Supplemental Order Clarification does not
necessarily require, as a prerequisite to an audit, that an ILEC make an explicit
showing of "concern." BellSouth Telecomms., Inc. v. NuVox Communications,
Inc., 2006 WL 2617123, at *40 (N.D. Ga. Sept. 12, 2006). If the FCC does not
necessarily even require an ILEC to demonstrate "concern," then it cannot
absolutely require an ILEC to provide additional specificity above and beyond
that concern, such as circuit identity or detailed documentation.

The Plaintiffs argue that the audits will be too burdensome for them
without these additional notice requirements, especially if BellSouth audits all
EELs every year. However, the FCC clearly limits the potential for abusive audits
through the annual audit and reimbursement requirement. The FCC also
provides protection for CLECs by stating that the independent auditor will
determine the sample to audit, consistent with standard auditing practices.
BellSouth acknowledges that the auditor is to determine the scope of the audit.

BellSouth Telecommunications, Inc. Post-Hearing Brief, at 52. Thus, BellSouth will not audit all EELs every year unless this practice is consistent with standard auditing. The FCC expects that the TRO's existing specific audit requirements are adequate protections for CLECs. Additionally, the FPSC in the instant case already provided an extra protection for the CLEC by requiring the ILEC to include in the notice the cause that the ILEC believes warrants the audit. Consequently, the lack of further requirements is not overly burdensome on the Plaintiffs.  The FPSC is correct on this issue.

## CLAIM 4: MAXIMUM DEPOSIT AMOUNT

The Plaintiffs argue that the FPSC's deposit structure is discriminatory because it requires a more burdensome deposit for the Plaintiffs than other CLECs with whom BellSouth has interconnection agreements with. The Telecommunications Act provides that CLECs must be provided nondiscriminatory access to network elements and interconnection "on rates, terms, and conditions that are just, reasonable, and nondiscriminatory." 47 U.S.C. §§ 251 (c)(2)(D) - (c)(3) (1999).[13]  The FCC requires that any service "must be made available to any other requesting telecommunications carrier upon the same terms and conditions. . . ."  FCC #96-325 at ¶167. ILECs must "provide unbundled elements under terms and conditions that would provide an efficient competitor with a meaningful opportunity to compete." Id. at ¶315.

---

[13]  It is assumed for the purposes of this order that a deposit provision is a term or condition.

Additionally, "[t]he terms and conditions pursuant to which an incumbent LEC provides access to unbundled network elements shall be offered equally to all requesting telecommunications carriers." 47 C.F.R. § 51.313(a).

In the instant case, the interconnection agreement between the parties allows BellSouth to demand a deposit if the existing CLEC does not meet certain standards, such as good payment history.  *See* Interconnection Agreement between BellSouth Telecommunications, Inc. and Xspedius Communications, LLC, Billing, § 1.8.5 (volume 4).  The FPSC decided that the maximum deposit for service billing in the parties' interconnection agreement shall not exceed two months' estimated billing for new CLECs or two months' actual billing for existing CLECs. Plaintiffs do not dispute the necessity of the deposit provision and do not argue  that the standards of creditworthiness are discriminatory.

Plaintiffs do argue, however, that the amount of the required deposit is discriminatory and unreasonable. The Plaintiffs had proposed to the FPSC that the maximum deposit be two months' estimated billing for new CLECs and one and one-half month's actual billing for existing CLECs.  As proof that the maximum deposit in this case is discriminatory, Plaintiffs point to BellSouth's agreement with another CLEC, ITC^DeltaCom.  That agreement requires deposits of one month for services billed in advance and two months for services billed in arrears; Plaintiffs argue in the alternative that they should have this same agreement with BellSouth.

"Equal terms and conditions" and "nondiscriminatory access" do not mean identical agreements, according to the FCC and court decisions. The Telecommunications Act "does not require that all interconnection agreements be identical." MCI Telecomms. Corp. v. Mich. Bell Tel. Co., 79 F. Supp. 2d 768, 776 (E.D. Mich. 1999); see also Levine v. BellSouth Corp., 302 F. Supp. 2d 1358, 1372 (S.D. Fla. 2004) (holding that it is not unreasonable to treat Louisiana customers differently than customers from other states when Louisiana regulation requires it). Certain factors may allow for non-identical agreements; "[w]here costs differ, rate differences that accurately reflect those differences are not discriminatory."  FCC #96-325 at ¶ 860. In addition, the FCC does not favor standardized agreements between ILECs and CLECs.  See FCC #04-164 at ¶12. Different agreements can contain different types of burdens and benefits, as long as the benefits equal out the burdens. See BellSouth Telecomms., Inc. v. F.C.C., 469 F.3d 1052, 1060 (D.C. Cir. 2006).

One of the main goals of the Act is competition. City of Rancho Palos Verdes, Cal. v. Abrams, 544 U.S. 113, 115 (2005). It is not unreasonable or discriminatory to reward good business practices; that is the nature of competition. BellSouth rewards good business practices by requiring deposits from CLECs that are uncreditworthy. The Plaintiffs do not argue that they are creditworthy, but they do argue that they are not so uncreditworthy as to warrant a large deposit.

BellSouth could conclude, in contrast, that the Plaintiffs do not have a sufficient payment history to meet the agreed-upon standard. Responses to interrogatories show that in 2004, Plaintiff Xpedius had a very poor on-time payment history and Plaintiff NuVox, while much better, was not perfect. Attachment C (confidential response to item no. 82). It does not seem unreasonable for BellSouth to have a deposit provision that encourages timely payment histories and other good business practices.

Plaintiffs argue that they are no less creditworthy than ITC^DeltaCom. However, even if similarly situated, the differences between the ITC^DeltaCom agreement and the Plaintiffs' agreement as arbitrated by the FPSC are not necessarily discriminatory. As BellSouth Telecomms., Inc. v. F.C.C. held, different burdens and benefits in different agreements are permissible if they equal out.  BellSouth Telecomms., Inc., 469 F.3d at 1060. Therefore, if BellSouth's agreement with ITC^DeltaCom contained other provisions which are more burdensome than similar provisions in the agreement with the Plaintiffs, a more burdensome maximum deposit provision for the Plaintiffs does not necessarily mean that the Plaintiffs' overall agreement is more burdensome for them. It should be noted that Plaintiffs were originally offered the same agreement as BellSouth has with ITC^DeltaCom, but Plaintiffs rejected it.  FAO at 67.

The FPSC's decision on deposits was not discriminatory, and neither was

it unreasonable.  BellSouth argues that two months' deposits are consistent with the telecommunications industry. BellSouth Telecommunications, Inc. Post-Hearing Brief, p. 68 (volume 32).  BellSouth has also said it will refund, return, or release any security deposit if it determines that Plaintiffs' creditworthiness indicates a deposit is no longer necessary. BellSouth Telecommunications, Inc. Post-Hearing Brief, p. 70 (volume 32).  Plaintiffs' interest in not tying up capital must be balanced against BellSouth's interest in assuring payment. It seems reasonable, as the FPSC found, that BellSouth's desire to use two months' maximum deposits is justified. The Plaintiffs can free up capital by meeting the creditworthiness standard to which they have already agreed.

**CONCLUSION:**

The FPSC has done an admirable job of "shooting at the moving target," MCI Telecomms. Corp., 112 F. Supp. 2d at 1293 n.10, and attempting to balance the interests of the ILEC's and CLEC's for the good of our state's economy. Having carefully reviewed the arbitration order in light of the applicable law and FCC decisions, this Court finds fault only with the FPSC's decision as to commingling.  Accordingly, it is

**ORDERED AND ADJUDGED** as follows:

1.    The Florida Public Service Commission's Final Order Regarding Petition for Arbitration (#PSC-06-0477-FOF-TP) and Final Order Approving Arbitrated Interconnection Agreements (#PSC-05-0975-

FOF-TP) are affirmed with respect to a) line conditioning, b) EEL

audits, and c) deposit amounts.

2.      Those provisions of the orders dealing with the requirement of

commingling 251 elements with 271 checklist elements are hereby

*vacated*.

**DONE AND ORDERED** this <u>first</u> day of June, 2007.

_s/ Stephan P. Mickle_

Stephan P. Mickle
United States District Judge